15 CV 3740

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIKA JIMENEZ and DAVID SMITH, formerly known as DAVID ODLE, on behalf of themselves and all others similarly situated; | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | |
| TOP RANK, INC.; MAYWEATHER PROMOTIONS LLC; ROBERT ARUM; EMMANUEL "MANNY" PACQUIAO; and FLOYD "MONEY" MAYWEATHER, JR.; SHOWTIME, INC.; and HOME BOX OFFICE, INC.; | |
| Defendants. | |



JUDGE PAULEY

RECEIVED
MAY 14 2015
U.S.D.C. S.D. N.Y.

## INTRODUCTION

1.      This is a class action brought on behalf of a class of all New York citizens who purchased a "pay per view" showing at their homes of the boxing match between Emmanuel "Manny" Pacquiao and Floyd "Money" Mayweather on May 2, 2015, at the MGM Grand Garden Arena in Las Vegas, Nevada (hereinafter "the Match").

2.      As indicated in greater detail herein, prior to the Match, each Defendant knew of, but failed to disclose, material facts relating to the sale and purchase of "pay per view" showings of the Match.

3.      Specifically, prior to the Match, each Defendant knew, but failed to disclose to class members, the public, or the Nevada Athletic Commission that Emmanuel "Manny" Pacquiao had suffered a severe torn rotator cuff injury to his right shoulder in April 2015 -- an

1

injury which had not healed and which Defendants knew had not healed as of the date of the Match.

4.    The existence of that undisclosed injury was not revealed to class members or the public until after the conclusion of the Match.

5.    This undisclosed injury was so severe that it rendered Pacquiao's right arm almost useless in the Match to such an extent that Defendant Pacquiao themselves later admitted after the Match that it was like trying "to fight one-handed."

6.    Despite this knowledge, Defendants intentionally opted not to disclose the existence of this injury to class members or the public until after the Match -- a decision which was motivated solely by Defendants' financial interests in that they wished to avoid losing the enormous financial benefits they received from "pay per view" fees paid by the class members, who reasonably expected to watch a match between two able-bodied, healthy, professional fighters.

7.    Accordingly, this Class Action Complaint (the "Complaint") seeks relief for Plaintiffs and the members of the proposed New York class, under the New York General Business Law § 349 and New York state law governing unjust enrichment, disgorgement, and implied contract duty of good faith and fair dealing.

## JURISDICTION AND VENUE

8.    There is federal subject matter jurisdiction over this matter under the Class Action Fairness Act because there are more than 100 proposed class members, some members of the proposed class and Defendants are citizens of different states, and the amount in controversy is more than $5 million.

#8024400.1(162739.002)

9.     This matter is properly venued in the Southern District of New York because

Plaintiffs and the proposed New York class reside in New York and the "pay per view" showing

rights at issue were sold in the State of New York.

## THE PARTIES

10.     Plaintiff Erika Jimenez resides in the Borough of Manhattan, New York, New

York.

11.     Plaintiff David Smith, formerly David Odle, resides in the Borough of Bronx,

New York.  Like all members of the proposed class, Plaintiffs purchased a "pay per view"

showing of the Match at his home in New York for between $89.95 and $99.95 and was

victimized by the same common course of conduct as every other class member as described

herein.

12.     Defendant Top Rank, Inc. is a Nevada corporation whose principal place of

business is located in Clark County, Nevada. At all times relevant hereto, Top Rank, Inc. served

as promoter for Defendant Pacquiao and as co-promoter of the Match.

13.     Defendant Emmanuel Pacquiao is an individual who resides in both the

Philippines and the State of California.

14.     Defendant Robert Arum is an individual who resides in Clark County, Nevada,

and who is both Treasurer and Director of Defendant Top Rank, Inc.

15.     Defendant Floyd "Money" Mayweather Jr. is an individual who resides in

Enterprise, Nevada.

16.     Defendant Mayweather Promotions, LLC is a limited liability corporation formed

by Defendant Mayweather whose principal business location is located at 4616 West Sahara

Avenue, Las Vegas, Nevada. At all times relevant hereto, Mayweather Promotions, LLC served as promoter for Defendant Mayweather and co-promoter of the Match.

17.    Defendant Showtime, Inc., is a Delaware corporation, with its principal business location in New York, New York.

18.    Defendant Home Box Office, Inc., is a Delaware corporation, with its principal business location in New York, New York.

## CLASS ACTION ALLEGATIONS

19.    Plaintiffs brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b) on behalf of a class defined as:

> **All New York citizens who purchased a "pay per view" of the May 2, 2015 boxing match between Emmanuel "Manny" Pacquiao and Floyd "Money"Mayweather for viewing at their residence in New York.**

20.    The class for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

21.    The proposed class is composed of over 25,000 persons.

22.    All members of the proposed class are fully ascertainable through records maintained by various Defendants, as well as electronic records maintained by the cable and satellite television providers servicing the homes owned by the class.

23.    No violations alleged in this Complaint are a result of any oral communications or individualized interaction of any kind between any class members and any defendant.

24.    Rather, all claims in this matter arise from the identical material omission of fact and common course of conduct alleged herein.

25.    There are common questions of law and fact affecting the rights of the class, including, inter alia, the following:

4

a.   Whether the fact that Defendant Pacquiao suffered an undisclosed, debilitating rotator cuff injury in his right shoulder prior to the Match was a material issue relating to the sale of "pay per view" showings of the Match under New York law;

b.   Whether each Defendant was aware of that injury prior to the Match and the date each such Defendant became so aware;

c.   Whether the failure to reveal the existence of that injury prior to the Match was an omission of material fact relating to the sale of services within the meaning of the New York General Business Law § 349;

d.   Whether each Defendant's conduct constituted a violation of New York General Business Law § 349;

e.   Whether each Defendant's common course of conduct, as alleged herein, renders them liable to provide total or partial refunds under a theory of unjust enrichment or disgorgement;

f.   Whether the circumstances give rise to an implied contract between Defendants and the class under New York law; and

g.   Whether Defendants' conduct violated the duty of good faith and fair dealing which exists in all such implied contracts.

26.   Plaintiffs are members of the class she seeks to represent.

27.   The claims of Plaintiffs are not only typical of all class members, they are identical.

28.   All claims of Plaintiffs and the class arise from the same material omission of fact and common course of conduct.

29.   All claims of Plaintiffs and the class are based on the exact same legal theories.

30.   Plaintiffs have no interest antagonistic to, or in conflict with, the class.

31.   Plaintiffs will thoroughly and adequately protect the interests of the class, having retained qualified and competent legal counsel to represent themselves and the class.

32.   Defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief for the class as a whole.

#8024400.1(162739.002)

33.     The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

34.     A class action is the only practical, available method for the fair and efficient adjudication of the controversy because, inter alia, the damages suffered by each class member were less than $100 per "pay per view" charge and, as such, individual actions are not economically feasible.

35.     Common questions will predominate, and there will be no unusual manageability issues.

## FACTUAL ALLEGATIONS

36.     The fight between Floyd "Money" Mayweather, Jr. and Manny Pacquiao, billed as "The Fight of the Century" and "The Battle for Greatness or Legacy," was a professional boxing match between the eight-division world champion Manny Pacquiao and undefeated, five-division world champion Floyd "Money" Mayweather, Jr. which took place on May 2, 2015, at the MGM Grand Garden Arena in Las Vegas, Nevada.

37.     As early as 2009, there were predictions that the Mayweather-Pacquiao match would be the highest-grossing prizefight in history.

38.     Disagreements as to fight terms between these two professional boxers' camps prevented the bout from coming to fruition from 2009 until 2015.

39.     Indeed, in 2010, "The Ring" magazine named the inability of two boxers' camps to come to agreement on fight terms as its "Event of the Year."

40.     At some point in early 2015, an agreement as to fight terms was reached.

41.     Tickets to see the fight live went on sale on April 23, 2015, with tickets being sold at prices ranging from $1,500 to $7,500 for the 16,800-person capacity MGM Grand.

42.     The tickets that went on sale to the public sold out within one minute.

43.     Media outlets reported that tickets for the Match sold on secondary markets for as much as $231,000 for one ticket.

44.     As per the contract reached between the two fighters and their management teams, the first $160 million of revenue, and the revenue received above $180 million, from the Match was split 60/40 between the fighters, with Mayweather receiving the larger 60% share. Revenue between $160 million and $180 million was split 51/49, with the 51% share going to the winner of the Match.

45.     This included the fees from the "pay per view" showing of the Match.

46.     Prior to the Match, it was announced that both fighters were expected to earn at least $100 million dollars in revenue from their participation.

47.     Although the Match was jointly promoted by Defendant Mayweather Promotions, LLC and Defendant Top Rank, Inc., the fight contract named Defendant Mayweather Promotions, LLC as the lead promoter of the fight.

48.     Because both Pacquiao and Mayweather currently had exclusive relationships with broadcasters, the telecast of the fight was a joint production between HBO and Showtime.

49.     Both HBO and Showtime broadcast documentary specials during the weeks leading up to the Match focusing on the two fighters' preparation for the unprecedented event.

50.     Showtime broadcast a four-part documentary series entitled "Inside Mayweather vs. Pacquiao," with three episodes focusing on Mayweather's preparation for the Match, and an epilogue airing the week following the fight.

51.     HBO aired "Mayweather/Pacquiao: At Last," which focused on the history of the prospective matchup and Pacquiao's preparation for the Match. It was broadcast on April 18,

7

2015, with a second half-hour installment airing on April 26, 2015.  HBO also broadcast encores of past Pacquiao fights.

52.     Defendants HBO and Showtime both encouraged viewers to order the "pay-per-view" in advance through a marketing campaign in conjunction with television providers.

53.     An HBO representative reported that the fight had attracted more advance orders than any other HBO "pay-per-view" event in history.

54.     Despite this, due to a high volume of last-minute orders of the "pay per view" showing of the Match, the start of the main event was delayed almost an hour in order to allow the broadcasters and television providers to address ordering problems and ensure as many purchases of the "pay per view" as possible.

55.     In most regions, including New York, the cost of a home "pay per view" showing of the Match was $89.95, with an additional $10 charge for high definition ("HD").

56.     This represented a 40% increase over the "pay per view" fee for Defendant Mayweather's 2013 fight against Saul Alvarez, which set the prior record for "pay per view" buys with $150 million in revenue.

57.     Prior to the Match, Defendants estimated that the "pay per view" fees for the Match would break that record and would bring in at least $270 million in revenue.

58.     Following the Match, it was reported that "pay per view" fees for the Match brought in at least $400 million in revenue.

59.     Indeed, the Match generated more in gross revenue than the Super Bowl played in February 2015.

60.     As impressive as the Match was as a revenue-generating engine, the Match itself was far from impressive.

#8024400.1(162739.002)

61.     Pacquiao lost by unanimous decision, with a lackluster performance that was widely panned by sports writers.

62.     Forbes magazine commentator Brian Goff called it "arguably, the least entertaining 'mega fight' in memory."

63.     The New York Times called the bout "far from electrifying."

64.     The Wall Street Journal remarked that it was a good thing there are 85 years left to top the "Fight of the Century."

65.     Soon after the Match, the reason for Pacquiao's poor performance finally became clear.

66.     Pacquiao's team revealed to the public for the first time at a post-fight news conference that Pacquiao had fought with a torn rotator cuff in his right shoulder.

67.     The rotator cuff tear reportedly occurred in early April 2015, during a training session at a gym owned by Pacquiao's trainer.

68.     Such training sessions had been closed to the media and the existence of the injury was not made known to the public or the class.

69.     Indeed, Dashon Johnson, a Pacquiao sparring partner, stated in a Facebook post after the Match that Pacquiao's sparring partners were sent home in April 2015 and told to keep the injury a secret.  According to Johnson:

> "We were asked not to mention anything to anyone but yes
> Manny got hurt during this camp with his right shoulder and it
> was messed up pretty bad! So bad his sparring partners
> including myself were asked to go home a few weeks out before
> the actual fight, which means a lot of work he could have put
> in for this fight was brought to a halt due to the fact that he
> could not spar really anymore and didn't want to mess it up
> more than he already had."

9

70.     The undisclosed injury to Pacquiao's right arm was so severe that Pacquiao ceased using his right arm during training and worked out using only left-hand-punching drills.

71.     The seriousness of this undisclosed injury cannot be overemphasized.

72.     In public comments after the Match, Pacquiao stated that "it's hard to fight one-handed."

73.     Two days after the Match, one of Pacquiao's doctors, Dr. Neal El Attrache, stated that Pacquiao had a "significant tear" of his rotator cuff and further stated that Pacquiao would require between nine (9) and 12 months of rehabilitation.

74.     As the post-Match media coverage continued, it soon became clear that all Defendants were well aware of Pacquiao's injury before the Match - a fact which they failed to share with the class or the public prior to the Match.

75.     Defendant Bob Arum, Defendant Top Rank, Inc.'s chief executive and Pacquiao's promoter, admitted he was aware of Pacquiao's injury before the Match and claimed that Pacquiao's team had sent a request to the Nevada State Boxing Commission (hereinafter "the Commission") before the Match for Pacquiao to be injected with painkillers for the Match.

76.     In post-Match comments, Arum stated that they considered postponing the Match because of the injury, but decided not to do so.

77.     Another Top Rank employee, Bruce Trampler, also admitted to knowing of the injury, stating that he had approached the Commission three hours before the Match, asking that the injection be permitted.

78.     Trampler complained that the Commission responded "no."

#8024400.1(162739.002)

79.     As the news conference was ending, however, Nevada State Boxing Commission

Chairman Francisco Aguilar took the microphone to say the Commission knew nothing of any

injury to Pacquiao until Trampler's request on May 2, 2015, just three hours before the Match.

80.     Commission Chairman Aguilar stated that if the Commission had been informed

of the injury in a timely manner, the Commission would have ordered an MRI to confirm the

injury and possibly postponed the Match.

81.     Commission Chairman Aguilar noted that Pacquiao had signed a Nevada Boxing

Commission medical disclosure form just hours prior to the Match. That form contained a check

mark "No" next to the question, **"Have you had any injury to your shoulders, elbow, or hands**

**that needed evaluation or examination?"** *See* Attachment A, Medical Disclosure Form signed

by Defendant Pacquiao.

82.     Commission Chairman Aguilar has since asked the Nevada state attorney

general's office to investigate.

83.     As stated by Commission Chairman Aguilar:

> **"Disclosure is a big thing for us, and honesty. The Commission
> at some point will have to discuss (Pacquiao's medical
> questionnaire). I've got to run through the process with the
> (Nevada) Attorney General (Adam Laxalt). But they do sign
> that document under the penalty of perjury."**

84.     It has also become clear that Defendant Mayweather and his promotion company,

Defendant Mayweather Productions, were also well aware of Pacquiao's injury prior to the

Match.

85.     This fact has been admitted by, inter alia, Defendant Pacquiao themselves, who

told members of the Filipino media that Mayweather even targeted the injury during the Match,

stating: **"I'm sure he found out. Somebody leaked it to him [i.e., Mayweather]. They knew."**

11

86.    Indeed, members of Mayweather's training team have publically admitted that they had a "mole" in the Pacquiao training camp, who made them aware of the injury and of the fact that Pacquiao's sparring partners had been sent home with instructions to keep the injury a secret.

87.    Thus, all of the Defendants were fully aware of Pacquiao's injury prior to the Match and that the injury had not been revealed to the public.

88.    Defendants' silence was motivated purely by profit.

89.    On September 9, 2014, Defendant Mayweather announced he will retire from boxing in 2015.

90.    Thus, the Match offered Defendants one last opportunity for an unprecedented payday before that retirement occurred.

91.    Defendants were fully aware that, without notice of the existence of this injury, purchasers of "pay per view" showings of the Match would naturally believe - as they had been led to believe - that they were purchasing the right to see a contest between highly-conditioned, healthy athletes in peak physical condition.

92.    Indeed, in a pre-Match interview with Showtime, Defendant Mayweather stated: "I'm in tip-top condition. I'm pretty sure he's in tip-top shape also."

93.    Defendants were fully aware that the record-breaking revenues being generated by "pay per view" fees for the Match would be severely adversely affected if the public knew that they were being asked to pay between $89.95 and $99.95 to see a boxing match between Mayweather and an opponent who was, for all practical purposes, a one-armed man.

94.    The failure to reveal the existence and extent of Defendant Pacquiao's injury was a material omission of fact relating to the sale of, inter alia, "pay per view" services.

12

**COUNT ONE**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**

95.     Plaintiffs incorporate all preceding paragraphs of this Complaint as though fully set forth at length herein.

96.     The actions of Defendants, as alleged herein, constituted sharp, deceptive, misleading, and unconscionable commercial practice in relation to the sale of services within the meaning of General Business Law § 349.

97.     This includes the omission of material fact that, prior to and at the time of the Match, Defendant Pacquiao had suffered a severe injury to the rotator cuff of his right shoulder which had deprived him of the effective use of his right arm.

98.     As alleged herein, each Defendant was aware of this omitted material fact, and that this fact had not been made known to the public or the class, prior to the Match.

99.     In addition, Defendant Pacquiao made an affirmative, written, false statement of material fact when Pacquiao had signed a Nevada Boxing Commission medical disclosure form prior to the Match which contained a check mark "No" next to the question: **"Have you had any injury to your shoulders, elbow, or hands that needed evaluation or examination?"** *See* Attachment A, Medical Disclosure Form signed by Defendant Pacquiao.

100.    Plaintiffs and the class each suffered an ascertainable loss of money and property as a result of Defendants' use of the unconscionable business practice and material omission described herein.

101.    Specifically, Plaintiffs and the class were each charged $89.95 (plus $10 more for HD), an amount that was far in excess of typical "pay per view" fees for other recent boxing events.

13

102.    Had Plaintiffs and the class known of Defendant Pacquiao's injury, and that the extent of that injury would require him to effectively fight one-handed, Plaintiffs would not have purchased the "pay per view" and the class could have made an informed choice as to whether to purchase a "pay per view" showing of the Match at the record-setting prices demanded.

103.    At the very least, Plaintiffs and the class were deprived of the benefit of their bargain, in that they received something less than they were promised: a boxing match between highly-trained, healthy professional boxers.

104.    This ascertainable loss was caused by the material omission alleged herein.

## COUNT TWO
## UNJUST ENRICHMENT / DISGORGEMENT

105.    Plaintiffs incorporate all preceding paragraphs of this Complaint as though fully set forth at length herein.

106.    By the acts alleged herein, Defendants each received a benefit from Plaintiffs and the class in the form of fees paid by Plaintiffs and the class for "pay per view" services.

107.    Each Defendant received a significant portion of those "pay per view" fees.

108.    The retention of that benefit by Defendants under the circumstances alleged herein would be unjust.

109.    By the facts alleged herein, equity demands that Defendants each disgorge themselves of this benefit and that the benefit, or a portion thereof, be returned to Plaintiffs and the class.

## COUNT THREE
## IMPLIED CONTRACT/ DUTY OF GOOD FAITH AND FAIR DEALING

110.    Plaintiffs incorporate all preceding paragraphs of this Complaint as though fully set forth at length herein.

14

111.    Under New York law, there exists an implied covenant of good faith and fair dealing in every express or implied contract.

112.    By the allegations set forth herein, a contract existed between Defendants and Plaintiffs, as well as between Defendants and each member of class.

113.    By the facts alleged herein, Defendants have breached that duty of good faith and fair dealing, causing actual damages to Plaintiffs and the class.

114.    Plaintiffs, on behalf of themselves and each member of the class, seeks all damages for such breach which are available under New York law, as well as all other appropriate relief available under such law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs asks this court to:

a.    Certify the proposed class under Rule 23(a) and (b);

b.    Enter an order for relief as described herein;

c.    Enter judgment in favor of Plaintiffs and class member for damages suffered as a result of the conduct alleged herein, to include interest and pre judgment interest;

d.    Award Plaintiffs reasonable attorneys' fees and costs; and

e.    Grant such other and further legal and equitable relief as the court deems just and equitable.

#8024400.1(162739.002)

### JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated:  May 13, 2015

WILENTZ, GOLDMAN & SPITZER, P.A.

By/s/ Kevin P. Roddy
   Kevin P. Roddy, Esq. [KR 2359]
   Kush Shukla, Esq. [KS 1227]
   Philip Tortoreti, Esq.
   (To Be Admitted *Pro Hac Vice*)
   90 Woodbridge Center Drive, Suite 900
   Woodbridge, NJ  07095
   Telephone:  (732) 636-8000
   E-mail:      kroddy@wilentz.com
                ptortoreti@wilentz.com

*Attorneys for Plaintiffs and the Proposed
Class*

#8024400.1(162739.002)

16

# ATTACHMENT A

135/74   45

# PRE-FIGHT MEDICAL QUESTIONNAIRE

**Contestant's Name** _Emmanuel D. Pacquiao_   **Age** _36_

Yes ( ) No (✗)   Have you had an MRI/MRA or CT scan of the head for any reason other than state licensing?  If yes, explain _____

Yes ( ) No (✗)   Have you ever had any eye problems, surgery (*Lasik, PRK*), or special examinations? If yes, explain _____

Yes ( ) No (✗)   Have you had any eye problems or eye issues since your annual exam was done? If yes, explain _____

Yes ( ) No (✗)   Do you have any serious medical illnesses, diseases, conditions, or allergies of any kind? If yes, explain _____

Yes ( ) No (✗)   Have you had any broken bones in last 6 months? If yes, explain _____

Yes ( ) No (✗)   Have you had any injury to your shoulders, elbows, or hands that needed evaluation or examination? If yes, explain _____

Yes ( ) No (✗)   Have you had any injury to your knees, ankles, or feet that needed evaluation or examination? If yes, explain _____

Yes ( ) No (✗)   Have you had any lacerations or cuts that required sutures or glue in the last 3 months? If yes, explain _____

Yes ( ) No (✗)   Have you had any surgeries?  If yes, explain _____

Yes (✗) No ( )   Have you taken or received *any* medication, drug, cream, inhalant, or injection, whether prescription, over-the-counter, from anyone or anyplace, in the last month?  If yes, explain _Lidocaine, bupivacaine, Celestone, PRP, Toradol_

Yes ( ) No (✗)   Have you taken or received *any* nutritional supplement or vitamin in the last month? If yes, explain _____

Yes ( ) No (✗)   Have you taken or received *any* medication, drug, supplement, cream, inhalant, or pill to help you lose weight or cut water for this bout? If yes, explain _____

Yes ( ) No (✗)   Have you suffered a KO, TKO, or any kind of loss of consciousness in the last 6 months during a bout, sparring, or any other activity?  If yes, explain _____

What was your weight 2 weeks ago? _145_   What was your weight 1 week ago? _146_

When was your last bout, and what was the result of that bout? _11-23-14   W UD12_

I hereby swear, under penalty of perjury, that the above information is true and correct to the best of my knowledge.

_____   _Mike Koncz_
Contestant's signature         Second's signature *and* name

NSAC Physician conducting this Evaluation: _____ on _5/1_, 2015

Revised-11/14